Good morning. May it please the Court. My name is Rishi Bindari, and I represent UTHE Technology Corporation. I would like to reserve three minutes for my rebuttal, and I'll be mindful of my time, as I've been told to do. Your Honors, this is actually, while this case has been going on for a very long time, it's been since 1993, pending since 1993, this issue before you right now is a very, very simple issue. There's essentially two questions which I'm going to address in my oral argument this morning. First, did UTHE USA suffer a direct injury, or was it just indirectly harmed because of some sort of injury that occurred to UTHE Singapore? Then the second question, which is really a case of first impression, where the Ninth Circuit will have the opportunity to lay down a rule which should be followed by everyone going forward, is a very simple rule that will be derived from the following question. If a corporation is incorporated in the United States and has its principal place of business in the United States, and it suffers a direct economic injury, is that a domestic injury under the Supreme Court's understanding of RJR Nabisco? So I'm going to start with the first one, which is a little bit more complicated, but still relatively straightforward. The second one, as you'll see, is an absolute no-brainer. It's going to be very easy for you to determine that this is a domestic injury. If we find that there is no direct injury to the United States Corporation, we do not have to deal with the second question. True? That's correct. Absolutely correct. And so the first question, and the essential inquiry about whether or not it's a direct injury, is to determine whether or not UTHE USA suffered an injury distinct from the injuries, if any, that were suffered by UTHE Singapore. This Court in Pareto in 1998 stated something very similar. It said the pivotal question is whether the injury is incidental to or an indirect result of a direct injury to the corporation or to the whole body of its stock or property. If it is those things, if UTHE USA, the reason why I'm here today is to defend UTHE USA, because it just suffered some sort of incidental injury to something that happened to UTHE Singapore, it is not a direct injury. Let me see if I've got the facts straight. Sure. The conspirators here, and you won the arbitration award of $9 million, the conspirators here conspired to take away business from? From UTHE Singapore. UTHE Singapore. That's right. And they were successful. Yes. And as a result, the value of UTHE Singapore was driven down in the eyes of the market. True? No, that is incorrect. That is incorrect. That last part. Well, wasn't that your claim that what the conspirators did was to spirit away the business of UTHE Singapore so that UTHE Singapore's income and, therefore, profit and, therefore, value was driven down? No. So, Your Honor, we have a slightly different – our case is a little bit different. You may give it a spin, as was mentioned in the last case by my esteemed colleague, but the facts are those, are they not? No, Your Honor. Now, was there any fraud involved in the issuance of the securities? No, there's no fraud involved in the issuance. Okay. So it's not a case of – it's not a 10B-5 situation where there's a fraud in the issuance of securities or manipulation of securities. Your conspirators weren't saying the title which USA or UTHE USA has as to the shares of UTHE Singapore is invalid because they stole the shares. They're not saying that. Correct. So what they're doing is they're driving down the business of UTHE Singapore. No, Your Honor. So that's where I respect what you said. All right. Give me your version. Let's see what the – but remember the difference between the facts and the version. Yes, absolutely, Your Honor. So this is a swindled shareholder case. Okay. That is the facts of this case. This is a swindled shareholder. What happened is UTHE USA sold its shares for less than the amount that it would have sold the shares had it not been defrauded. And how was it – what was the contact between the conspirators and the shareholders? Yes. There was lots of direct contact between the conspirators and UTHE USA. So the conspirators were saying to the shareholders in the United States, your shares in UTHE are not valuable, and they're going down in value, and they were misrepresenting the facts? Yes, exactly right. How were they doing that rather than taking the business away from UTHE Singapore? Right. Sure. So what they're doing is they were sending faxes showing that UTHE Singapore didn't have any orders. It was showing that they didn't have any revenue coming in from customers who had bought. Now, those things were false. That was fraud. Now, I'd like to give you one analogy, which I think is the framework to think about this. It would be like having a car, and the mechanic, when you take your car in to get the car fixed, sees that, oh, my gosh, this is a beautiful vintage car that is worth hundreds of thousands, if not millions of dollars, if it runs properly and it's in mint condition. So the mechanic pours some sugar into the gas tank and then sends a fraudulent car fax report saying that this car had been in Hurricane Harvey, so it suffered some sort of flood damage. False. So then when those false statements, using wire fraud because they sent a fax machine, putting sugar in a gas tank would not be a predicate RICO Act, but if it was done through wire fraud or mail fraud, a second sort of thing was done to provide false information about the condition of the car. And then the mechanic says, I'd like to buy your car. I'll offer you $1,000 for it because it doesn't run. It was in Hurricane Harvey. These things make it basically worthless. It costs money to take it off your hands because people will have to junk it and spend money to actually get rid of this car. I'll pay you $1,000 for it. And the person sells the car. That person was defrauded and swindled in the exact same way that the USA was swindled. That is what happened here. So what is the difference between what you got and your $9 million? What's that? Why is that any different than what you got in the $9 billion? Your Honor, it's not. In other words, the whole $9 million is this? The whole $9 million is so that is exactly what the first. My worry about that is this. Supposing I even believe you that this claim might be an individual claim for the corporation in the United States. What is the harm experienced by the shareholders, now the United States, which is different or distinct from the harm its subsidiary suffers on account of the same fraud? It's totally different, Your Honor. What's the difference? I mean, I can only measure it by the value of the shares. No, Your Honor. How do I measure it any other way? It seems to me that you've already suggested this is not a claim for lost sales of its own generator and transducer products. It's not a claim for lost sales. It's not a claim for overhead expenses. It's not any of those. The only thing it is is a RICO claim. Yes, it is a RICO claim, and I'll explain to you exactly how. If you could just give me a moment. The reason why Ooty Singapore did not suffer a commensurate harm with the swindling that was suffered by Ooty USA is because Ooty Singapore wasn't actually being driven or wasn't going out of business. There was false faxes and there was information suggesting that Ooty Singapore was not being able to sell to the customers that it used to have in the old days, but those things weren't true. Ooty Singapore was actually doing just fine, and the reason why there was All you're doing is trying to say this is an individual claim. I want to know how I'm going to determine what the harm is that is experienced by your shareholders, any different from the harm that its subsidiaries suffered on the account of the same fraud. Okay, so one very direct way to think about it is Ooty Singapore did not suffer any harm whatsoever by Ooty USA getting swindled out of its shares. Ooty Singapore can never, ever sue anybody. Well, Ooty Singapore is the one who was losing all the sales. No, Your Honor. Ooty Singapore is the one from whom all of these things were then sent to another person. So how can you say they didn't suffer any harm? Because it was sent to entities that controlled Ooty Singapore subsequently. But it doesn't matter. Ooty Singapore might have suffered some harm. That's why. So where in your briefing do you suggest what the damages are and how would they be valued other than shares? The way in which they're valued is In your briefing? Yes. I mean, I looked. It seems to me that in your briefing the total value you have is the difference between the value of the shares after this fraud and the value of the shares before the fraud. And I'm still trying, again, to understand why that isn't the same harm experienced by the corporation. Okay, sure. Let me go back to my analogy. Maybe this will make it clear. Your analogy didn't make it clear to me. Well, let me try one more. So maybe you better try again. Okay. Because I'm looking at what the damages are after everything you've said. And I, frankly, have argued about this with my law clerk for some time as to whether there's even any individual claim at all. But when we get to supposing there is one, where's the damage alleged? The damage alleged is that the difference between the value of the shares that it would have been and the value of the shares after the fraud. And that's the damage. No, Your Honor. What is it then? And where is it in your brief? Sure. It's in our brief. We What is it first? Okay, sure. The difference is what my client thought the shares were worth when they were being fed false information about Ooty Singapore's customers. They thought these shares were worth nothing. The shares were not actually worth nothing because Ooty Singapore had not been damaged to the extent that my client was told Ooty Singapore had been damaged. So it is like the fake car facts being sent saying that there was a flood and Hurricane Harvey and this car was damaged. The car was not actually damaged in Hurricane Harvey. That did not reduce the price of the car in any way whatsoever. Ooty Singapore was still a thriving great business with lots of customers. But the false statements that were made to my client, Mr. Goodson, by people at Atrium, the defendants in this case, led him to believe that Ooty Singapore had lost all of its customers. It led him to believe that they weren't being able to collect from the customers that they had delivered stuff to. So he thought that his shares were worthless, but in fact Ooty Singapore was a thriving business. That's the shareholder swindling fact pattern that we're dealing with. And there's no other way to recover. This wasn't argued to Judge Alsop, though. What's that? This was not argued down below. Down below it was strictly our injury is the loss in the value of shares. Yes, it is the loss in the value of the shares between what they should have been worth and what we believe they were worth because there was a fraud. And how do we know what that is? What number do you apply to that? That was where the expert analysis came in, where we're going to have expert testimony, where in the Singapore arbitration, that is precisely what the Singapore arbitration established. They said, you know what, if there hadn't been all these lies told to you, Mr. Goodson, if you hadn't been defrauded, then you would have known that your shares were worth this amount, which was $9 million more than what you sold them for. That's what this case is about. Now, why are we still here? After you get there, then why doesn't Sparling take away all you got? Sparling has nothing to do with this case. Just a minute. Sparling says suits for harm to the corporation may not form the basis of a civil RICO claim. Exactly correct. And that's exactly what we have here. No, exactly incorrect. Because, well, I guess I want to hear what you have to say. Sure. Sparling was a case where there were shareholders, and the shareholders were basically sued. You have a case where there's a shareholder. No. You're a corporation. No, Your Honor. We're suing because we were swindled out of our shares. But I can explain why it's different in any event. There's two differences. First, Sparling is a case where there was a shareholder. When you have a shareholder who says, listen, this company had its assets diverted and taken away, or there was other sorts of corporate waste, that is a derivative claim of the company, and so the shareholders have to bring a derivative claim. What we're saying here is that's not what happened. Uthi Singapore is just like a car that there was a false Carfax report saying that it had been flooded in Hurricane Harvey. It was actually a thriving business, and it was doing great. Uthi Singapore wouldn't have necessarily been worth less or considerably less. Could I just disagree on what Sparling says? No, Your Honor. I agree with you what Sparling says. Your position is that the damage was not to Uthi Singapore. The acts which caused damage to the shareholders was a misrepresentation in communications by the people who were running Uthi Singapore that the sales were going down, the customers weren't paying. Yes. Not the fact that they stole the business for their own business. Exactly right. Yes. Thank you, Your Honor. Now, that wasn't the basis of your winning the arbitration award, was it? Yes, it was, Your Honor. And in fact, the best place to find that is on page 10 of the defendant's opposition brief. Footnote 1 on page 10 says the following. I'm just going to read the quote. The arbitrator expressly concluded Uthi USA was not entitled to any damages for the time after the stock sale because the question when determining Uthi USA's damages is not what Uthi Singapore lost but what Uthi USA itself lost. That is what we are talking about. Uthi USA lost shares that were worth over $9 million because they were lied to. They were lied to, not because they stole the money. They stole the business. Right. Exactly. I got you. Exactly right. So now once we know that this is a direct injury that Uthi USA suffered, just like the Singapore arbitration said it, just like page 10 of the defendant's brief says it, once we know that, then we get to the really easy question where this panel is going to have the opportunity to lay down this rule very clearly. The easy question is when an American company suffers a direct economic injury. Is it a domestic injury under Morrison? Yes. You're over your time. Oh. Thank you. All right. Meaning I've reserved a little bit for rebuttal or no? You can have two minutes for rebuttal. Okay. Now, Ms. Rath, or Ms. Nath, I'm going to ask you to answer what Mr. Bhandari has been saying because this is, to me, a new focus. That's a kind word for version on this case. All right. Thank you. All right. Go ahead. Judge, may I agree? You can't change the record and the facts in this case. It's a five-year-old case. You mean you can have two sides to an issue but only one side to the facts? Correct. So what's always been alleged in this case and in the Singapore arbitration is the same, right? And Youth USA has always alleged that the allegations were interested in the evidence or lack of evidence. Agreed, Your Honor. And just to remind the Court, this is a very old case. As Mr. Bhandari said, we have had several dispositive motions and orders in this case and a previous Ninth Circuit appeal. And before that Ninth Circuit appeal, fact and expert discovery had been closed, so we were ready for trial. So there is a very well-established record. Youth USA has always set forth evidence and alleged that there was a conspiracy to destroy Youthy Singapore, to divert all of Youthy Singapore's business, and that's the subsidiary, not Youthy USA, and destroy it as a competitor or take it over at a depressed price. So this new notion of misrepresentations does not fit the record. The record establishes that what Youthy USA has always claimed is that the Singapore defendants set up a secret company that competed with Youthy Singapore. They diverted. They actually diverted the Youthy Singapore orders. They diverted the Youthy Singapore customers. Let me ask you a question. Sure. Was it argued below in the district court that it wasn't the destruction of Singapore business, but the misrepresentation by the people who were running the Singapore business to USA shareholders that the business was being ruined and caused the injury? Not to my recollection, Your Honor. So what we just heard from Mr. Briandri, is something new to interest us in the case? Well, so Mr. Bhandari has always argued that they should get that it's not a securities fraud claim, but somehow because they lost their shares, they should be able to... It's a stock swindle claim. He's claiming a misrepresentation of the shareholders as to the business in Singapore, so the shareholders become depressed and sell cheap. And there's never been any evidence or arguments submitted showing, no, Youthy Singapore wasn't actually worthless. They just pretended it was worthless, right? I mean, the evidence has always been... I will ask you to cite for me to the record when you have your two minutes, where there's evidence that it wasn't the destruction of Singapore business, but the misrepresentation by the people who are running a Singapore business to the USA shareholders that caused the injury. So take down that note, and I don't want to hear it's in the record. I want to hear E-R blank. All right? Now, go back. So, again, Your Honor, the evidence has always been that the Youthy Singapore documents were stolen, the orders were stolen, the employees. There was a mass walkout of employees. So there was no misrepresentation about the state of Youthy Singapore. The state of Youthy Singapore was that, as Youthy USA has always claimed, it was destroyed. It was, quote, faced with immediate collapse. It was worthless. And so because Youthy USA owned 100 percent of the shares, they had to sell those shares at a depressed price to the Singapore defendants. Just to note, the atrium defendants, who are the defendants in this case, had no involvement in the sale of the shares. They were not a part of the purchase agreement. You know, they are alleged to have assisted in stealing the business of Youthy Singapore, right? They're alleged to have withheld commissions that they would have owed to Youthy Singapore and to also have not told the director of Youthy Singapore, who is also the CEO of Youthy USA, about those issues and amending the Youthy Singapore contract. So, but, again, this wasn't about misrepresentations that Youthy Singapore had been destroyed. Youthy Singapore had been destroyed because everything was taken away from it. And what's important, again, is that the only claim left here is to treble the Singapore arbitration award. And as Your Honor had stated, that award, Judge Smith, I believe that was you, that award expressly compensated Youthy USA for the harm from the loss on the sale of the shares. I mean, that is what the award is for. The award can be for the loss in the value of the shares. I think the issue here is whether the loss is alleged to be caused and there's evidence that it was caused, A, by destruction of Singapore's business, that's your position. Correct. Or B, by misrepresentation by Singapore officers and directors that the business was being destroyed when it wasn't being destroyed. Right, Your Honor. That's his position. And again, and I won't go through it all again, but, again, the evidence has always been that the orders were actually stolen. The documents were actually taken. I mean, there were no employees left in Youthy Singapore anymore right before the sale. To make misrepresentations. No, to run the company. So Youthy Singapore had actually been destroyed. I mean, that's why the sale occurred. That's why the price was paid that was paid because there was nothing left of the company. Again, Youth USA has always said it was on the verge of immediate collapse. There was nothing left. Your position is that the employees really did walk out. They did. Not that there was a misrepresentation. They were walking out while they were busy as bees in Singapore. That's correct, Your Honor. Yes. And when you look at that, I mean, that is what Youth USA is seeking to trouble here. That's all that's left. And I don't need to go into it unless the Court has questions. But just to make clear, Youth USA previously alleged additional harm. They always tried to say we suffered something else. We suffered something more, the loss of our own orders, the loss of our own customers. And all of that was dismissed before the previous appeal, and it was not appealed by Youth USA. So the only claim that Youth USA has left is to trouble the $9 million Singapore Arbitration Award. I understand that. But I guess you've had a good conversation with Judge Bayh about the direct injury or whether it was direct or whether it wasn't. Supposing it is, supposing that you could say it's direct, why doesn't Sparling say even in that instance there's nothing because it's all derivative to the corporation and therefore not a RICO claim? Well, and Sparling does say that. Sparling says it. Ahn says it. I mean, because the — and just as the Court found, I mean, the Court below found the depletion of the assets of Youthy Singapore, which in turn caused the depressed valuation of Youthy's shareholder interest, that's the harm. And so I agree with you, Your Honor. Sparling does — Sparling and Ahn both say that is an indirect, incidental harm to the harm to Youthy Singapore. Youthy Singapore suffered the direct harm. Well, we start, frankly, as I understand it, with Feldman, where Feldman says that if all of the corporation's stockholders are harmed solely because they're stockholders, then the claim is derivative in nature. That's what Feldman says. So then you go to the next thing. Sparling says thus claims that the corporation was defrauded by a third party and therefore suffered a loss are derivative. That's what Sparling says. Well, then if they're derivative, then it seems to me that we can go to Pan Pacific and say, therefore clearly derivative, falling on every stockholder, majority and minority alike, and fell on each other on a per-share basis, that makes it again derivative. And then if I get to RICO, in the RICO context, shareholders may not pursue RICO claims based on derivative claims. And we're done. And he loses. I agree, Your Honor. And just to emphasize — I'm not even talking about direct or indirect. I'm just talking about taking the case law, applying it to what he says is a direct law charge, and saying, nonetheless, you're done. Well, and I agree, Your Honor. I mean — I mean, that's what I was trying to get him to focus on, and that's why I want you to talk about it. Am I out of it with that idea? Well, I mean, I think that there — so we're talking here about injury that is derivative of harm to the corporation, right? And that is considered an indirect injury. And under RICO, RICO has a proximate cause requirement, and that means you need but-for cause, right? You actually — so not all factually injured plaintiffs can bring a RICO claim, right? So even if the U.S.A. was factually injured, they can't get RICO relief unless that claim is for a direct injury, and that's the U.S. Supreme Court cases Holmes and Onza. You disagree with your learned opponent on the basic fact in this case. He — he stated a theory, perhaps maybe even a factual — has a factual basis, that the injury was through misrepresentation to the shareholders, that the business was going fine. You're saying, wait a minute. The — the arbitration award found that the business was ruined and all the employees left, and that was the injury. All right. What are we to do? Is there a triable issue of fact as to what caused the injury? Well, there's certainly not a material issue of fact based on the record in this case. Again, there are several orders. There — fact and expert discovery has been completed. And, you know, Youth of the U.S.A. has always itself said that — and I understand that you're making a distinction, but they've always said all we were compensated for in the Singapore arbitration was for the loss on the value of our shares. So, you know, my argument to you is that that in itself, that being the injury, is enough to make it indirect. So the fact that the damage, the injury, is the value of the shares lost, which reflects the loss to Youthy Singapore, and that's what it is, right? I mean, that's what it reflects. Youthy Singapore's value went down, and therefore, correspondingly, the value of the shares went down. And that is enough, you know, to make that injury indirect and not redressable under Rego. But you concede, Ms. Nath, that if there is evidence in the record that — from which a reasonable jury could find that the injury was caused not because of the malfunction of the Singapore subsidiary, but because of the misrepresentations and communications that the Singapore subsidiary was failing, as Mr. Bondry says, wouldn't that be a tribal issue of fact? Well, Your Honor, are you saying is it a circumstance where Youthy Singapore was completely fine, where nothing was wrong with Youthy Singapore? But they were lying to the parent. But they were completely lying. I suppose if it's a circumstance, I mean, that sounds — that sounds like a more traditional securities fraud claim, which Youthy USA has said is not its claim in this case, by the way. Where does they say it's not their claim in the case? A securities fraud claim. They say it in their brief. They say it now is a securities fraud claim. They say it's a stock swindle case. But they say in their brief it's not a securities fraud case. So it's like the second-to-last page, I think. It's during the discussion of the PSLRA. In their reply brief, page 14 of the reply brief, defendants' appellees argue that Youthy's RICO claim is nothing more than a classic securities fraud claim and should therefore be barred. While this is also incorrect. And they say it in other places, I believe, as well. And that's — you know, the PSLRA was a side issue. But, Your Honor, again, I mean, the record is replete with the damages, the injury that Youthy USA has claimed, always claimed, was suffered, which was always — they stole Youthy USA's orders. They stole Youthy USA's — or, sorry, excuse me. They stole Youthy Singapore's orders. They stole Youthy Singapore's customers. They stole Youthy Singapore's documents. And because of that, Youthy Singapore was valueless, and we were forced to sell our shares at a depressed price. I mean, that — you will find that in the record over and over and over again. So to the extent that they're claiming misrepresentations, again, I'll remind the Court, the Atrium defendants, who are the defendants here, not the Singapore defendants, had nothing to do with the sale of the shares anyway. Right? They were not parties to it. They were not involved in it. And then to the extent that they're talking about faxes, those are faxes relating to Atrium's orders that they allegedly withheld commissions on. It would be faxes back and forth about those orders. But the evidence has always been, allegedly, that Atrium withheld those commissions, actually withheld them, didn't pretend to withhold them. They just didn't pay them. They kept them for themselves. Okay. Thank you very much. All right. Mr. Bhandari, you're going to give me some record citations of what to me is a very novel theory argued for the first time here. So, Your Honor, to stop and argue for the first time here, if you look at the — if you look at the opposition brief, page 37 of it, we argued it very vociferously in front of Judge Alsop as well, where there was, you know, a back-and-forth where I said when we were bamboozled — our injury was when we were bamboozled in the sale of our shares, we were saved less than we should have by a huge margin. Now, the reason we received less than we should have — That's how you calculate the damages. We're not talking about that. We're talking about causation. Yes. The reason we received — Was it a tribal issue of fact as to causation? Was it the misrepresentations, or was it running the business down? Yes. And our theory on why we sold our shares for less than they were worth is you find Mr. Goodson's affidavit, which is submitted in the record, if you look at page 56 of the record, paragraph 149, it says, Paragraph 150 says, consistently reported at a lower value than those shown in the audited — annual audited accounts. If you look at page 64 of the record, this is an affidavit from Catherine Yip, who was one of the conspirators in — who testified in paragraph 8, And then I'm skipping ahead. It says — Well, that goes Ms. Nass' way. They're actually doing the company in, not misrepresenting to the shareholders that the company was doing badly. Let me skip ahead to what she says next. Taking over Uti Singapore was one step in the overall plan for Atrium and the employees and officers of Uti Singapore to profit by cutting Uti USA out of the picture and preventing future payments to Uti USA. In fact, we knew that it might not be possible to take over Uti Singapore if Uti USA and Mr. Goodson could not be convinced to sell it. That is why we set up a secret shell corporation in 1992 to divert the Uti Singapore orders and to continue the business of distributing products to Uti Singapore customers in the event that Uti Singapore remained under the control of Uti USA. So they lied. Uti Singapore was doing just fine. That's water in her wheel, not yours. No. The setting up a secret shell corporation and misleading Mr. Goodson. It's not misrepresenting sales. It's setting up a diversion of the business. But if Mr. Goodson knew that all that was happening was the business was being diverted to a shell corporation, if he had been told that, he didn't sell his Uti Singapore shares because Uti Singapore has a wonderful direct claim against the people who are stealing its money. He didn't know that. He was lied to and was told Uti Singapore. That's speculation on your behalf. Thank you very much. You've used up your time. Okay. Thank you. The case will be submitted, and that will be the end of our calendar for today. The court thanks counsel for the very interesting argument, and we will be in recess until tomorrow morning at 9 o'clock.
judges: Bea, N.R. Smith, Lasnik